Devin A. McRae, State Bar Number 223239
  dmcrae@earlysullivan.com
Michael Smarinsky, State Bar Number 82889
  msmarinsky@earlysullivan.com
Mark C. Humphrey, State Bar Number 291718
  mhumphrey@earlysullivan.com
EARLY SULLIVAN WRIGHT
  GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
Telephone:  (323) 301-4660
Facsimile:  (323) 301-4676

Attorneys for Plaintiffs
ONZA PARTNERS SL and ONZA
ENTERTAINMENT SL

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ONZA PARTNERS SL, a Spanish Sociedad Limitada, and ONZA ENTERTAINMENT SL, a Spanish Sociedad Limitada,<br><br>Plaintiffs,<br><br>vs.<br><br>SONY PICTURES ENTERTAINMENT INC., a Delaware corporation, SONY PICTURES TELEVISION INC., a Delaware corporation, ERIC KRIPKE, an individual, KRIPKE ENTERPRISES, a California corporation, NBCUNIVERSAL MEDIA, LLC, a Delaware limited liability company, SHAWN RYAN, an individual doing business as MIDDKID PRODUCTIONS, JOHN DAVIS, an individual, DAVIS ENTERTAINMENT COMPANY, a Nevada corporation, and DOES 1-100, inclusive,<br><br>Defendants. | Case No.: 2:16-cv-07269-SWW-AFMx<br><br>(U.S. District Judge Stephen V. Wilson)<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS BY SONY PICTURES ENTERTAINMENT INC., SONY PICTURES TELEVISION INC., ERIC KRIPKE, AND KRIPKE ENTERPRISES**<br><br>**Date:**        **February 13, 2017**<br>**Time:**        **1:30 p.m.**<br>**Courtroom:  10A** |

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ..................................................................................1

II.   LEGAL STANDARDS .........................................................................3

      A.    RULE 12(B)(6) MOTION TO DISMISS ...................................3

      B.    THE EXTRINSIC TEST FOR COPYRIGHT INFRINGEMENT ........4

III.  THE COURT SHOULD NOT ENGAGE IN A PREMATURE
      SUBSTANTIAL SIMILARITY ANALYSIS...........................................6

      A.    LIMITING THE COURT'S SUBSTANTIAL SIMILARITY
            ANALYSIS TO ONLY THE PILOT EPISODES OF
            MINISTERIO AND TIMELESS IS INCONSISTENT WITH
            THE COMPLAINT'S ALLEGATIONS AND CONTROLLING
            LAW ..........................................................................................6

      B.    DEFENDANTS' PROPOSED COMPARISON OF ONLY THE
            PILOT EPISODES FAILS TO TAKE INTO ACCOUNT THE
            NATURE OF THE WORKS AT ISSUE .....................................10

      C.    DEFENDANTS PREMATURELY SEEK TO DETERMINE
            SUBSTANTIAL SIMILARITY TO AVOID DISCOVERY ON
            DIRECT COPYING AND ACCESS ..........................................12

IV.   PLAINTIFFS' BREACH OF IMPLIED CONTRACT CLAIM
      SURVIVES SONY'S AND KRIPKE'S SPECIOUS ARGUMENT
      THAT THE PRIOR PUBLICATION OF THE ORIGINAL SERIES
      DEPRIVED PLAINTIFFS' IDEAS OF CONTRACT PROTECTION ..........15

      A.    PLAINTIFFS HAVE STATED A CLAIM UNDER THE
            DESNY LINE OF CASES........................................................18

            1.    Desny ...........................................................................18

            2.    Blaustein ......................................................................19

            3.    The Quirk Case ............................................................21

V.    CONCLUSION ...................................................................................24



EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

# TABLE OF AUTHORITIES

## Cases

*Allison v. Cal. Adult Auth.,*
    419 F.2d 822 (9th Cir. 1969)................................................................3

*Apple Computer, Inc. v. Microsoft Corp.,*
    35 F.3d 1435 (9th Cir. 1994)..............................................................9

*Arpin v. Santa Clara Valley Transp. Agency,*
    261 F. 3d 912 (9th Cir. 2001)...........................................................10

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................3

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................3

*Blaustein v. Burton,*
    9 Cal. App. 3d 161 (1970)..........................................................passim

*Braden v. Wal-Mart Stores, Inc.,*
    588 F3d 585 (8th Cir. 2009)...............................................................4

*Branch v. Tunnell,*
    14 F. 3d 449 (9th Cir. 1994) ..............................................................3

*Christianson v. West. Pub. Co.,*
    149 F. 2d 202 (9th Cir. 1945)........................................................5, 6

*Danjaq, LLC v. Universal City Studios, LLC,*
    2014 WL 7882071 at *3-*4 (C.D. Cal. Oct. 2, 2014)......................8

*Desny v. Wilder,*
    46 Cal. 2d 715 (1956)................................................................passim

*Dillon v. NBCUniversal Media, LLC et al.,*
    2013 WL 3581938 at *7 (C.D. Cal. Jun. 18, 2013) ...............4, 7, 12

*Duckhole Inc. v. NBC Universal Media LLC,*
    2013 WL 5797279 at *4 (C.D. Cal. Sep. 6, 2013)...........................7

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.,*
    462 F. 3d 1072 (9th Cir. 2006)......................................................6, 7

*Gable v. Nat'l Broad. Co.,*
    727 F. Supp. 2d 815 (C.D. Cal. 2010)......................................4, 5, 12

*Gadh v. Spiegel,*
    2014 WL 1778950 at *3 n. 2 (C.D. Cal. Apr. 2, 2014)...................7

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

*Gilbert v. New Line Prods., Inc.*,
  2009 WL 7422458 at *2 (C.D. Cal. Nov. 16, 2009) .................................... 4, 6

*Gilligan v. Jamco Dev. Corp.*,
  108 F. 3d 246 (9th Cir. 1997) ........................................................... 3

*Idema v. Dreamworks, Inc.*,
  162 F. Supp. 2d 1129 (C.D. Cal. 2001) ........................................... 4

*Kouf v. Walt Disney Pictures & Television*,
  16 F. 3d 1042 (9th Cir. 1994) ........................................................... 5

*Mediacom Southeast LLC v. BellSouth Telecomms., Inc.*,
  672 F3d 396 (6th Cir. 2012) ............................................................. 3

*Metcalf v. Bochco*,
  294 F. 3d 1069 (9th Cir. 2002) ....................................... 4, 5, 13, 14

*Mir, M.D. v. Little Co. of Mary Hosp.*,
  844 F. 2d 646 (9th Cir. 1988) ........................................................... 3

*Montz v. Pilgrim Films & Television, Inc.*,
  649 F.3d 975 (9th Cir. 2011) .......................................................... 22

*Nami v. Fauver*,
  82 F.3d 63 (3rd Cir. 1996) ............................................................... 3

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
  602 F. 3d 57 (2d. Cir. 2010) ........................................................... 7

*Peterson v. Grisham*,
  594 F.3d 723 (10th Cir. 2010) ......................................................... 3

*Quirk v. Sony Pictures Entm't Inc.*,
  2013 WL 1345075 (N.D. Cal. 2013), ................................... passim

*Rescuecom Corp. v. Google Inc.*,
  562 F.3d 123 (2d Cir. 2009) ............................................................. 3

*Rottlund Co. v. Pinnacle Corp.*,
  452 F. 3d 726 (8th Cir. 2006) ........................................................ 12

*Shaw v. Lindheim*,
  919 F. 2d 1353 (9th Cir. 1990) ................................................. 13, 14

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
  562 F.2d 1157 (9th Cir.1977) ................................................. 6, 9, 15

*Silas v. Home Box Office, Inc.*,
  __ F. Supp. 3d __, 2016 WL 4409191 at *4-*5 (C.D. Cal. Aug. 17, 2016) 7, 10

*Stanley v. Columbia Broad. Sys.*,
  35 Cal.2d 653 (1950) ............................................................... 16, 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

iii

*Swirsky v. Carey*,
　　376 F. 3d 841 (9th Cir. 2004) ............................................................. 5

*Thomas v. Walt Disney Co.*,
　　2008 WL 425647 at *2 (N.D. Cal. Feb. 14, 2008) ............................. 7

*Three Boys Music Corp. v. Bolton*,
　　212 F. 3d 477 (9th Cir. 2000) ............................................................. 4

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
　　715 F. 2d 1327 (1983) ........................................................................ 9

*White v. Twentieth Century Fox Corp.*,
　　572 F. Appx. 475 (9th Cir. 2014) ................................................... 8, 9

*Wild v. NBC Universal, Inc.*,
　　788 F. Supp. 2d 1083 n. 1 (2011) ...................................................... 7

*Zella v. E.W. Scripps Co.*,
　　529 F. Supp. 2d 1124 (C.D. Cal. 2007) ..................................... 5, 8, 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

## I.    __INTRODUCTION__

This copyright action does not deal with a fly-by-night producer alleging that his generic idea for a reality TV show was copied by a major network.  Nor does it deal with a vexatious self-represented litigant claiming multiple studios have ripped off his cocktail napkin-scrawled film treatment.  And it certainly does not deal with a naïve writer blurting out his idea for a high concept buddy comedy to an industry insider at Soho House.  Instead, this case is about an infringing knock-off of a fully produced, internationally broadcast and licensed Spanish time travel adventure television series entitled *Ministerio del Tiempo* ("*Ministerio*" or the "Original Series")[1] *created while negotiations for an American version were taking place*.

In July 2015, Plaintiffs Onza Partners SL and Onza Entertainment SL (together, "Plaintiffs") were exchanging license terms with Defendant Sony Pictures Entertainment Inc. (together with Sony Pictures Television Inc., "Sony") for an American version of *Ministerio*.  The idea that Defendant Eric Kripke (with his production company, Kripke Enterprises, "Kripke") be the writer/director/showrunner for the American adaptation was floated while license negotiations were underway, and Sony and Kripke reviewed *Ministerio*'s pilot episode and other materials.  Then, incredibly, Sony abruptly ceased negotiating with Plaintiffs and announced a strikingly similar time travel series ("*Timeless*" or the "Infringing Television Show") with Defendant NBCUniversal Media, LLC ("NBC"), Kripke, Defendant Shawn Ryan (doing business as Middkid Productions, "Ryan") and Defendant John Davis (with his company, Davis Entertainment Company, "Davis").[2]  *Timeless* premiered in October 2016, shortly after Plaintiffs filed this lawsuit for copyright infringement and breach of implied-in-fact contract.

---

[1]     Plaintiffs are beneficial copyright owners of *Ministerio* and the format for the series (referred to as the "Format" in the Complaint). (Compl. ¶ 2.)
[2]     Unless otherwise noted, Sony, NBC, Kripke, and Davis are referred to collectively herein as "Defendants."

1

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

Defendants now remarkably ask the Court to decide substantial similarity on a Rule 12(b)(6) Motion to Dismiss ("Motion"), *submitting only the pilot episodes* of each series for review—even though the Complaint alleges infringement of the *entire Original Series*.  This ignores that, under Ninth Circuit precedent, all works must be before the Court for substantial similarity to be evaluated on a motion to dismiss.[3]  With only the pilot episodes before the Court, it's impossible to determine whether both *series* are substantially similar under the Extrinsic Test.  Defendants' proffered comparison also makes no analytical sense, and is at odds with the public policy of the Copyright Act.

It's evident that this premature Motion is an effort to foreclose discovery on the Complaint's allegations of direct copying and significant level of Defendants' undeniable access to *Ministerio*.  Yet this discovery that Defendants seek to preemptively bar is material, and thus essential, to the Extrinsic Test for substantial similarity under the inverse ratio rule.  Defendants also seek to deprive Plaintiffs of their opportunity in discovery to set forth a comprehensive list of similarities across both television series by asking the Court to hastily hinge the test on Defendants' false characterization of the illustrative similarities list pled in the Complaint.

Defendants also seek dismissal of Plaintiffs' claim for breach of implied-in-fact contract by arguing that such a claim cannot proceed because *Ministerio* had already been broadcast in Spain prior to when the implied-in-fact contract was entered into.  This mischaracterizes and misapplies controlling case law.

Accordingly, Defendants' Motion is not well taken and should be denied in its entirety.

---

[3]    Defendants falsely state that Plaintiffs only allege that the Format has been infringed, and so, say Defendants, the pilot-to-pilot comparison is appropriate because *Ministerio*'s pilot is where each show's format is "established and presented."  (Mot. 4:18-21.)  This is of course demonstrably false—throughout the Complaint, Plaintiffs allege that the *entire Original Series* was infringed, *in addition to the Format*.  (*See, e.g.,* Compl. ¶¶ 34, 36.)



163139.6

## II.     LEGAL STANDARDS

### A.     Rule 12(b)(6) Motion to Dismiss

Motions to dismiss are viewed with disfavor and are to be granted rarely.  *See Gilligan v. Jamco Dev. Corp.*, 108 F. 3d 246, 249 (9th Cir. 1997).  The sole issue raised by a Rule 12(b)(6) motion to dismiss is whether the facts pleaded would, if established, support a plausible claim for relief.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  In considering Rule 12(b)(6) motions, courts do not inquire whether a plaintiff will ultimately prevail, only whether they are entitled to offer evidence to support their claims.  *Nami v. Fauver*, 82 F.3d 63, 65 (3rd Cir. 1996); *see Allison v. Cal. Adult Auth.*, 419 F.2d 822, 823 (9th Cir. 1969); *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010).

Courts generally cannot consider material outside of the complaint, though may consider exhibits submitted with the complaint, as well as documents which are not physically attached to the complaint but "whose contents are alleged in [the] complaint and whose authenticity no party questions."  *See Branch v. Tunnell*, 14 F. 3d 449, 453-454 (9th Cir. 1994).  It's proper for the court to consider matters subject to judicial notice pursuant to Federal Rule of Evidence 201.  *See Mir, M.D. v. Little Co. of Mary Hosp.*, 844 F. 2d 646, 649 (9th Cir. 1988).

Facts pleaded in the complaint are accepted as true for purposes of a Rule 12(b)(6) motion to dismiss.  *Twombly*, 550 U.S. at 556.  In addition to accepting all factual allegations in a complaint as true, a court must "draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."  *Rescuecom Corp. v. Google Inc*., 562 F.3d 123, 127 (2d Cir. 2009); *Mediacom Southeast LLC v. BellSouth Telecomms., Inc.*, 672 F3d 396, 400 (6th Cir. 2012).  All reasonable inferences from the facts alleged are drawn in a plaintiff's

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

favor in determining whether the complaint states a valid claim. *Braden v. Wal-Mart Stores, Inc.*, 588 F3d 585, 595 (8th Cir. 2009).

## B.   The Extrinsic Test for Copyright Infringement

In order to prove copyright infringement, a plaintiff must show that the defendant copied protected elements of his work of authorship either through evidence of direct copying or through a showing that (1) the defendant had access to the copyrighted material and (2) the two works at issue are substantially similar. *Three Boys Music Corp. v. Bolton*, 212 F. 3d 477, 481 (9th Cir. 2000).

To prove access, a plaintiff must show that the defendant had a "reasonable opportunity" or "reasonable possibility" of viewing the plaintiff's work prior to creating the infringing work. *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 824 (C.D. Cal. 2010) (Wilson, J.), citing *Three Boys Music*, 212 F. 3d at 482. Reasonable access requires more than a "bare possibility," and "may not be inferred through mere speculation or conjecture." *Three Boys Music* at 482. Access is often proven when a "particular chain of events is established between the plaintiff's work and the defendant's access to that work." *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1175 (C.D. Cal. 2001). The Ninth Circuit also recognizes the "inverse ratio rule," under which courts "require a lower standard of proof of substantial similarity when a high degree of access is shown." *Three Boys Music* at 485. The inverse ratio rule may be triggered by evidence that the defendant actually read the plaintiff's work. *See Metcalf v. Bochco*, 294 F. 3d 1069, 1075 (9th Cir. 2002); *see also Dillon v. NBCUniversal Media, LLC et al.*, 2013 WL 3581938 at *7 (C.D. Cal. Jun. 18, 2013) (inverse ratio rule triggered due to "high degree of access" shown by defendant actually having received plaintiff's treatment).

To determine substantial similarity, Ninth Circuit courts apply a test which looks to the extrinsic components of the works at issue. *Gilbert v. New Line Prods., Inc.*, 2009 WL 7422458 at *2 (C.D. Cal. Nov. 16, 2009). This "Extrinsic Test" is an objective test based on a comparison of whether two works "share a similarity of

163139.6

ideas and expression as measured by external, objective criteria." *Gable*, 727 F. Supp. 2d at 831, citing *Swirsky v. Carey*, 376 F. 3d 841, 845 (9th Cir. 2004). The Extrinsic Test thus focuses on "articulable similarities" between the plot, themes, dialogue, mood, setting, pace, characters and sequence of events. *Kouf v. Walt Disney Pictures & Television*, 16 F. 3d 1042, 1045 (9th Cir. 1994). A plaintiff may satisfy the Extrinsic Test by showing that "so many generic similarities" between two works appear in a "particular sequence" in both works. *Metcalf v. Bochco*, 294 F. 3d at 1073-1074.

Furthermore, as the Ninth Circuit explained in *Landsberg v. Scrabble Crossword Game Players, Inc.*, "the degree of substantial similarity required to show infringement varies according to the type of work and the ideas expressed in it. Some ideas can be expressed in myriad ways, while others allow only a narrow range of expression. ***Fictional works generally fall into the first category***." 736 F.2d 485, 488 (9th Cir. 1984) (emphasis added).[4]

The Ninth Circuit has recognized that substantial similarity may be determined on a Rule 12(b)(6) motion to dismiss ***only where "the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison."*** *Christianson v. West. Pub. Co.*, 149 F. 2d 202, 203 (9th Cir. 1945) (emphasis added). This "rather obvious principle" has been applied by the Ninth Circuit for more than 50 years. *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d

---

[4]     *See also id.* ("The basic idea of a fictional work might be that classic, boy meets girl. This idea can be expressed, as it has been through thousands of years of literature, with infinite variations in setting, sequence of incident, and characterization. An author wishing to write yet another work using the 'boy meets girl' idea can choose from a wide range of materials in composing his or her own expression of the idea. Therefore a new work incorporating that idea need not be a verbatim copy or close paraphrase of an earlier work to infringe that work. ***A resemblance in details of setting, incident, or characterization that falls short of close paraphrase may be enough to establish substantial similarity and infringement***. . . . Factual works are different. Subsequent authors wishing to express the ideas contained in a factual work often can choose from only a narrow range of expression.") (emphasis added).

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

1124, 1130 (C.D. Cal. 2007).

## III.   THE COURT SHOULD NOT ENGAGE IN A PREMATURE SUBSTANTIAL SIMILARITY ANALYSIS

### A.   Limiting The Court's Substantial Similarity Analysis To Only The Pilot Episodes Of *Ministerio* And *Timeless* Is Inconsistent With The Complaint's Allegations And Controlling Law

Defendants urge the Court to hastily determine a dispositive issue of substantial similarity. Yet in support of their Motion, Defendants have submitted only the pilot episodes of *Ministerio* and *Timeless* for the Court's review, even though the Complaint specifically alleges that *Timeless* infringes the **entire** *Ministerio* series. This runs contrary to decades of Ninth Circuit precedent, the Complaint's allegations and common sense.

Generally, summary judgment is the earliest substantial similarity will be determined, though doing so even then is not highly favored by courts. *See Gilbert*, 2009 WL 7422458 at *2; *see also Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F. 3d 1072, 1076-1077 (9th Cir. 2006). Ninth Circuit courts may evaluate the issue on a motion to dismiss, but only where "the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison." *See Christianson*, 149 F. 2d at 203.[5]

In support of their Motion, Defendants have only made the pilot episodes of *Ministerio* and *Timeless* available to the Court. The Court therefore cannot

---

[5]   Notably, many cases where substantial similarity is evaluated on a motion to dismiss deal with reality television, i.e., factual works, for which the scope of copyright protection is far thinner than it is for the **fictional** works here. *See, e.g., Landsberg*, 736 F.2d at 488; *see also Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1165 (9th Cir.1977) (noting that the defendants there could choose from myriad ways to create puppets that would express the idea contained in plaintiff's television series—"a fantasyland filled with diverse and fanciful characters in action"—and thus, as a result, although defendants pointed to numerous differences between their puppets and plaintiffs', they were still held to be substantially similar.)

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

determine substantial similarity, because pertinent Ninth Circuit authority confirms that on a motion to dismiss, such a determination requires a **complete** review of **all** works alleged in the complaint.  Not one of the cases has done so over the plaintiff's objection, as here, that the defendants have supplied the Court with only self-serving partial excerpts of the works selected by the defendants in a manner that's contrary to the complaint's express allegations, i.e., where the *defendant* tries to re-write and delimit the plaintiff's copyright claim.[6]

Indeed, each decision that has adjudicated the Extrinsic Test on a motion to dismiss takes care to confirm that *all* of the works at issue are properly before the court, whether it is because they are attached to the complaint, judicially noticed or incorporated by reference.[7]  Where the issue of the completeness of the record has

_____

[6]     While the court in *Funky Films v. Time Warner Entertainment Co.*, 462 F. 3d 1072 (9th Cir. 2006), declined to examine the entire *Six Feet Under* TV series for purposes of substantial similarity when the complaint alleged that the entire series infringed (instead examining the first three episodes), this came on summary judgment, after the parties had had the chance to actually develop their cases beyond the pleadings.  Moreover, that case only involved purported infringement of the plaintiff's single script, in stark contrast to Defendants' infringement of Plaintiffs' multi-season, fully produced and broadcast series as alleged here.

[7]     *See, e.g., Gadh v. Spiegel*, 2014 WL 1778950 at *3 n. 2 (C.D. Cal. Apr. 2, 2014) (noting long-held California precedent that review of substantial similarity on motion to dismiss requires all works to be properly before the court and noting that plaintiff's script and defendant's movie were both properly attached to complaint and judicially noticed); *White v. Twentieth Century Fox Corp.*, 572 F. Appx. 475, 477 (9th Cir. 2014) (court declined to consider film screenplays and Blu-Ray release as infringing plaintiff's script because screenplays and Blu-Ray weren't alleged as infringements in complaint); *Dillon v. NBC Universal Media LLC*, 2013 WL 3581938 (C.D. Cal. Jun. 18, 2013) (court considered reality TV treatment and show referenced in complaint); *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F. 3d 57 (2d. Cir. 2010) (all works to be considered were attached to plaintiff's complaint, and so everything "necessary in order to make" substantial similarity finding were before the court, making evaluation at pleadings stage appropriate); *Duckhole Inc. v. NBC Universal Media LLC*, 2013 WL 5797279 at *4 (C.D. Cal. Sep. 6, 2013) (court expressly invoked doctrine of incorporation by reference to find seven-page treatment and seven episodes of TV series referenced in complaint were properly before the court); *Silas v. Home Box Office, Inc.*, __ F. Supp. 3d __, 2016 WL 4409191 at *4-*5 (C.D. Cal. Aug. 17, 2016) (court could consider plaintiff's materials and *Ballers* television series through judicial notice, and since these were specifically alleged in the complaint, they could also be considered as "documentary facts whose contents are alleged in the complaint"); *Wild v. NBC Universal, Inc.*, 788 F. Supp. 2d 1083, 1090 n. 1 (2011) (court took judicial notice of graphic novel and fourth season of *Heroes* for substantial similarity comparison); *Thomas v. Walt Disney Co.*, 2008 WL 425647 at *2 (N.D.

7

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

arisen, the court has always been guided by what's alleged in the complaint.  For instance, in *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1128 (C.D. Cal. 2007), the court reviewed eight episodes of Rachael Ray's show (which were specifically referenced in the complaint), DVDs of which were provided to the court by the defendants.  There was no question about the completeness of the plaintiff's work, for it was comprised only of a one-page treatment and a three-page script for a cooking show.  *Zella*, 529 F. Supp. 2d at 1126.  The plaintiff, however, argued in opposing the motion to dismiss that the court needed to consider all 150 episodes of Rachael Ray's show.  *Id.* at 1131.  The problem for the plaintiff there was that they ***expressly limited their complaint's copyright infringement allegations to only those eight episodes*** submitted by the defendant and considered by the court as infringing the plaintiff's "work." *See id.* at 1132 (noting that because plaintiffs claimed to have watched all 150 episodes, then "as masters of their Complaint, Plaintiffs must allege the best facts for their case.  Presumably, Plaintiffs have done so by alleging the content of the episodes they believe most substantially resemble [their script and treatment].").

Similarly, in *White v. Twentieth Century Fox Corp.*, 572 F. Appx. 475, 476-477 (9th Cir. 2014), a plaintiff in *pro per* argued that, in addition to considering the films he alleged infringed on his screenplay, the court should also consider the films' screenplays and a Blu-Ray release.  The Court declined to do so, finding that "the underlying screenplays [were] irrelevant because ***the operative question [was] whether the films—the allegedly-infringing materials—and White's screenplay [were] substantially similar***," and also that the plaintiff "***[did] not allege that the Blu-Ray version [was] substantially similar to his screenplay***," so it was properly

---

Cal. Feb. 14, 2008) (screenplay and *Finding Nemo* film were properly before the court via judicial notice); *Danjaq, LLC v. Universal City Studios, LLC*, 2014 WL 7882071 at *3-*4 (C.D. Cal. Oct. 2, 2014) (comparing 23 *James Bond* screenplays referenced in complaint to spy movie script).

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

1    disregarded as well.  *White*, 572 F. Appx at 477 (emphasis added).

2        Here, in stark contrast to *Zella* and *White*, Plaintiffs' work is comprised of a

3    multi-season television series which was fully produced, broadcast and licensed

4    around the world, and, dispositively, the Complaint alleges that Defendants' entire

5    series infringes Plaintiff's entire series.[8]  As such, the entire series of both shows

6    should properly be considered.

7        Moreover, while it's true that the first step of the Extrinsic Test requires the

8    plaintiff to "identify the source(s) of the alleged similarity between his work and the

9    defendant's work," *e.g., Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435,

10   1443 (9th Cir. 1994), no case has ever held that this obligation resides in the

11   complaint.  *Zella* and *White* merely tell us that the plaintiff must properly identify

12   the works at issue.  Here, Plaintiffs have done that by alleging that Defendants'

13   complete series infringes Plaintiffs' complete series (and although not obligated, by

14   alleging an ***illustrative*** similarities list which, by the way, was not drawn solely

15   from the two pilot episodes before the Court).  Nothing more is required.  *See, e.g.,*

16   *Iqbal*, 556 U.S. 662, 678.

17       Defendants provide no argument in support of their proposed limitation of

18   comparisons.  Nor do they cite to any pertinent authority.[9]  Instead, Defendants

19   _____

20   [8]    This is not to mention the distinction that here Defendants simply decided to
     copy Plaintiff's work during license negotiations between the parties, and that
21   during negotiations it was discussed that one of them should be the writer for the
     licensed project (who, as it turns out, is the writer for the infringing project).  The
22   facts here are thus much closer than *Zella* to *Sid & Marty Krofft Television Prods.,*
     *Inc. v. McDonald's Corp.*, 562 F.2d at 1172, *where, as here, the defendants*
23   *engaged in extensive negotiations to license the plaintiffs' characters and settings*
     *for use in advertisements, while they were, unbeknownst to the plaintiffs,*
24   *simultaneously developing advertisements that utilized infringing copies of the*
     *plaintiffs' works.*
25   [9]    In their anticipated reply brief, Defendants might point to *Twentieth Century-*
     *Fox Film Corp. v. MCA, Inc.*, 715 F. 2d 1327 (1983), a case in which Defendants'
26   attorney served as counsel of record.  That case involved allegations that the
     *Battlestar Galactica* film and TV series infringed on copyrights in the original *Star*
27   *Wars* film.  Though the court's substantial similarity analysis was indeed limited to
     the *Star Wars* film and the *Battlestar Galactica* pilot episode (as well as the
28   theatrical release it was later re-edited to become), this was because the plaintiffs
     had ***stipulated*** that the trial court's decision with respect to the pilot would "be

                                              9
                        **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

EARLY
SULLIVAN
WRIGHT
GIZER &
McRAE LLP
ATTORNEYS AT LAW

WGM

163139.6

merely make the bald assertion that "[c]omparing the initial episodes of each series. . . is the proper analytical approach to evaluating Plaintiffs' claim." (Mot. 4:19-21.) Defendants further assert the meaningless tautology that "[t]he pilot episodes of *TDOT* and *Timeless* are the best evidence of their contents." (Mot. 5 n. 4.) Those two cryptic statements are, in a nutshell, the sum and substance of Defendants' argument in favor of limiting the comparisons between the two series to just their pilot episodes.[10]

Ultimately, if Defendants wanted to trigger this premature inquiry, the burden was on them to supply the Court with *all* materials alleged in the Complaint. *See Zella*, 529 F. Supp. 2d at 1128.[11]  Instead, Defendants assert conclusory statements with no support whatsoever in the hope that the Court will dismiss this case based on an incomplete, arbitrary, and premature analysis of the works at issue.  This gambit should be given short shrift.

## B.   Defendants' Proposed Comparison Of Only The Pilot Episodes Fails To Take Into Account The Nature Of The Works At Issue

Analytically, it's ***impossible*** properly to compare two television series in

---

deemed applicable to the television episodes which followed the initial program." *Id*. at 1328 n.1.  There has been no such stipulation here.

[10]     That is, other than the false statement that "Plaintiffs' pilot of episode [sic] of *TDOT* and Defendants' pilot episode of *Timeless*. . . ***are the sole evidence on the issue of substantial similarity of protected expression***," which simply ignores the specific allegations of the Complaint that the ***entire series*** has been infringed. (Mot. 6: 16-18 (emphasis added).)

[11]     Defendants open their Motion by declaring that time travel is a "well-established genre in all forms of media," referencing works they claim are exemplars of this "genre," such as the *Back to the Future* films. (Mot. 1:9-17 n.1.) They then use this prior art to argue that *Ministerio* is an example of a "generic story line" involving "characters whose time travel alters the course of history, often preventing bad things from happening," which allegedly pervades the genre and is thus not copyrightable. (*Id*.)  Defendants did not request judicial notice of these works, and so they should not be considered by the Court.  *Arpin v. Santa Clara Valley Transp. Agency*, 261 F. 3d 912, 925 (9th Cir. 2001) (extraneous evidence outside of the complaint is not to be considered on motion to dismiss). Moreover, even if Defendants did request judicial notice of these works, courts have declined to grant similar requests involving purported exemplars of standard "genre" elements.  *See Silas*, 2016 WL 4409191, at *6-*7 & n.8; *Zella*, 529 F. Supp. 2d at 1129; *Duckhole*, 2013 WL 3581938, at *4.

163139.6

copyright terms by limiting the dissectable subject matter to their pilot episodes alone.  The pilot episode of a television series tends to be a ***presentation*** tool (first to the commissioning broadcaster, and then to the viewing audience) of the basic, but merely ***introductory***, initial premises of the series characters, setting, mood and fundamental plot devices.  Here, in both *Ministerio* and *Timeless,* the characters, the time-travel concepts and the first "adventure" are introduced (among other elements) in their respective pilot episodes.  However, both series also by design set up in their originally appearing characters (and, in future episodes, new characters) personality traits, motivations and "back story" revelations that will change the way the audience perceives a given character and his or her actions.  As an example, a pilot episode's villain can morph over the season into a hitherto unrevealed "good guy," while an ostensible established "good guy" can become a secret enemy within.  Such shifts in character motivations produce ongoing series-arc twists that perforce *cannot be revealed in the pilot.*  A useful analogy might be the comparisons of the first chapters of two novels that, while they introduce the reader to the basics of plot, character and setting, require the balance of the book to complete the full development and resolution (or, in a series of books, as in the Harry Potter or James Bond novels, an interim resolution) of the story.  ***Comparing only the first chapter of two books would not enable a full and proper comparison of protectable similarities precisely because they have not yet been revealed***.  The same principle obtains here with regard to television series, especially in a case where, as here, there is already at least one season (or at least multiple episodes) of each series available to permit a more detailed, granular comparison.

Last, the analysis which Defendants urge the Court to undertake runs contrary to public policy underlying copyright law.  Were the Court to adopt Defendants' analysis and compare only the pilot episodes of *Ministerio* and *Timeless*, it would be a boon for future infringers.  If infringers knew that a court would only look to pilot episodes, they would differentiate their pilots as much as

possible from the shows they were copying, saving countless potential similarities for later episodes, which would be outside the scope of judicial review.

Accordingly, this Court should reject Defendants' attempt to limit the "substantial similarity" comparison of *Timeless* to *Ministerio* solely to their respective pilot episodes.

### C.   Defendants Prematurely Seek To Determine Substantial Similarity To Avoid Discovery On Direct Copying And Access

In the Complaint, Plaintiffs alleged upon information and belief that Defendants directly copied the Format and Original Series.  (Compl. ¶¶ 34, 36.)  In addition, the Complaint describes a chain of events whereby Defendants gained access to the Format and Original Series and even began to negotiate terms with Defendant Sony, at which point they abruptly began to develop what became *Timeless*.  (Compl. ¶¶ 2-19.)  In discovery, Plaintiffs expect to find evidence confirming that Defendants indeed copied the Original Series (in the form of party admissions and witness accounts of the direct copying of *Ministerio*), or at the very least had access to the Original Series prior to when *Timeless* was announced.

Accordingly, it's evident why Defendants seek such a premature determination of substantial similarity based on an incomplete record: they are worried about what Plaintiffs will uncover.  If Plaintiffs find further evidence of direct copying, Defendants' chances of prevailing diminish significantly.  *Rottlund Co. v. Pinnacle Corp.*, 452 F. 3d 726, 732 (8th Cir. 2006) ("To prove direct copying is to disprove independent creation.").  But even if Plaintiffs do not find evidence of direct copying, additional evidence of access could trigger the Ninth Circuit's inverse ratio rule—under which a strong showing of access lowers the burden of proof necessary to prove substantial similarity.[12]  *Dillon v. NBCUniversal Media,*

---

[12]    This Court has recognized that the inverse ratio rule may be applied in certain circumstances, but declined to do so on summary judgment due to a lack of access.  *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 828 (C.D. Cal. 2010) (Wilson, J.).  There, a writer alleged that the television show *My Name Is Earl*

163139.6

*LLC et al.*, 2013 WL 3581938 at *7 (C.D. Cal. Jun. 18, 2013) (inverse ratio rule triggered due to "high degree of access" shown by defendant actually having received plaintiff's treatment)

Defendants also seek to stop Plaintiffs from taking discovery on that dispositive issue. In the Complaint, Plaintiffs set forth a *non-exhaustive* list of 18 similarities between *Ministerio* and *Timeless*. These similarities relate to the plot, themes, dialogue, mood, setting, pace and characters contained within both shows across multiple episodes. Plaintiffs are thus entitled to take discovery on the issue of substantial similarity, as well, in order to fully determine all of the similarities between *Timeless* and *Ministerio* as a whole.

Discovery is particularly important here because the similarities between *Ministerio* and *Timeless* operate similarly to those in *Metcalf v. Bochco*, 294. F. 3d 1069 (9th Cir. 2002), where the court determined that the totality of similarities between the defendants' produced TV show, *City of Angels*, and the plaintiffs' treatment and screenplay, went beyond the necessities of the theme and "'[belied] any claim of literary accident.'" *Id.* at 1074, quoting *Shaw v. Lindheim*, 919 F. 2d 1353, 1363 (9th Cir. 1990). Specifically, even though the similarities proffered by the plaintiffs were not protectable when considered individually, "the presence of so many generic similarities and the common patterns in which they arise" helped the plaintiffs to satisfy the Extrinsic Test.[13] *Id.* The court found that this was so

_____

infringed on his screenplay. The plaintiff's theory of access was based on an attenuated series of assumptions arising out of the plaintiff's purported submission of his script to the Gersh Agency in mid-1995, at which time the creator of *My Name Is Earl* was a client of one of the agency's agents. *Id.* at 818. Yet there was no documentary evidence the script was ever submitted to Gersh, and because the claim was entirely based on the presumption that certain people may have crossed paths and may have theoretically discussed the script, this Court held that the plaintiff could not create a triable issue of access "merely by showing 'bare corporate receipt' of his work by an individual who shares a common employer with the alleged copier." *Id.* at 818, 828. In direct contrast here, Plaintiffs allege a series of events in which the Original Series DVD was given to an agent who in fact showed it to and discussed it with Sony, Kripke and others. (Compl. ¶¶ 2-19.)

[13] Those individually generic similarities included, but were not limited to, the setting of a county hospital in inner-city Los Angeles with mostly African-

13

EARLY
SULLIVAN
WRIGHT
GIZER &
McRAE LLP
ATTORNEYS AT LAW

163139.6

because the "particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element," noting that while each note in a scale may not be copyrightable, the "pattern of notes in a tune may earn copyright protection." *Id.*; *see Shaw*, 919 F. 2d at 1363.

The main female characters in *Timeless* and *Ministerio* provide pertinent points of comparison, because in both *Ministerio* and *Timeless*, the female team member: (1) tends to be the "brains" of the trio; (2) has an academic background (with unorthodox elements); (3) has knowledge of historical accuracy helpful—or crucial—to carrying out the given missions; (4) learns about her as-yet unknown alternative future by seeing a family photograph; (5) is warned by a seeming antagonist that the governmental agency for which she is working has mixed, darker motives, and that, to prove the antagonist knows what he/she is talking about, reveals facts about her life, family, past, etc.; and (6) knows about her time travels through the device of a revealed journal.  (Compl. ¶ 35.)

These similarities, generic on their own, together suggest a copyrightable pattern that Plaintiffs are justified to examine in discovery.  *See Shaw*, 919 F. 2d at 1363 (where main characters are simultaneously well dressed, wealthy, self-assured and have expensive tastes, "the totality of the similarities . . . goes beyond the necessities of [defendants' work's] theme and belies any claim of literary accident").  Plaintiffs' entitlement to develop this and other issues is also supported by *Landsberg v. Scrabble Crossword Game Players, Inc.*, in which the Ninth Circuit recognized that because generic ideas in fictional works can have "infinite variations in setting, sequence of incident, and characterization," a new work

---

American staffs; themes of poverty, race relations, and urban blight; young, good-looking, muscular African-American surgeon main characters who grew up in the neighborhood where the hospital was located; the main characters having made a choice to forego private practice to work in the inner city, finding it more rewarding; the main characters' romantic involvements; and the hospital's bid for reaccreditation being vehemently opposed by a Hispanic politician. *Metcalf*, 294 F.3d at 1073-1074.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

EARLY SULLIVAN WRIGHT GIZER & McRAE LLP
ATTORNEYS AT LAW

163139.6

incorporating prior ideas "need not be a verbatim copy or close paraphrase of an earlier work to infringe that work." 736 F.2d 485, 488 (9th Cir. 1984). *Landsberg* confirms that all which may be required to find substantial similarity of fictional works is "*[a] resemblance in details of setting, incident, or characterization that falls short of close paraphrase*. . . ." *Id.* (emphasis added).

Plaintiffs believe that the similarities outlined above and in the Complaint are the tip of the iceberg, and that a number of additional similarities exist which will further strengthen their copyright claim. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977). It is therefore vital that Plaintiffs take discovery to uncover further similarities, which can then be listed and analyzed, opined upon by experts, and presented for the Court to make an informed decision on substantial similarity. *See id.* (noting that expert testimony is appropriate for purposes of the Extrinsic Test). If substantial similarity is simply decided now, based on an incomplete record without the benefit of discovery, none of this will take place, and Defendants' improper tactics will be validated.

## IV. PLAINTIFFS' BREACH OF IMPLIED CONTRACT CLAIM SURVIVES SONY'S AND KRIPKE'S SPECIOUS ARGUMENT THAT THE PRIOR PUBLICATION OF THE ORIGINAL SERIES DEPRIVED PLAINTIFFS' IDEAS OF CONTRACT PROTECTION

Plaintiffs' second claim for relief against Sony and Kripke is for breach of implied contract under the line of cases beginning with *Desny v. Wilder,* 46 Cal. 2d 715 (1956). Under *Desny* and its progeny, California courts have held that "the act of disclosing [even] an unprotectible idea" can be protected under contract law, separate and apart from copyright law, if that disclosure is the "bargained for" consideration supporting a promise. *Id.* at 729. Thus, in making use of ideas disclosed to them by Plaintiffs in a situation where all parties involved understood that Plaintiffs expected to be paid for use of the ideas disclosed by them, Sony and Kripke violated Plaintiffs' rights under an implied-in-fact contract.

163139.6

EARLY
SULLIVAN
WRIGHT
GIZER &
McRAE LLP
ATTORNEYS AT LAW

Defendants Sony and Kripke *cannot* dispute that the *Desny* case protects *under contract law* (separate and apart from copyright law) the disclosure of an idea by an idea creator in circumstances like those present here, nor do they attempt to do so. What they *do* attempt to do, however, is mislead this Court by improperly twisting the holding of another case, *Quirk v. Sony Pictures Entm't Inc.*, 2013 WL 1345075 (N.D. Cal. 2013), in such a way as to turn both *Quirk* and *Desny* on their heads. What these Defendants contend here is nothing less than that an idea based upon an already published work cannot be protected under contract law.[14]

In making this staggering contention, Sony and Kripke utterly misread both *Quirk* and *Desny*. *Desny* itself states that "Even though the idea disclosed may be 'widely known and generally understood', it may be protected by an express [or implied] contract providing that it will be paid for *regardless of its lack of novelty*." *Desny*, 46 Cal. 2d at 733, quoting from Justice Traynor's dissent in *Stanley v. Columbia Broad. Sys.*, 35 Cal.2d 653, 674 (1950) (emphasis added). The idea at issue in *Desny*, which the court held could be protected by implied contract against misuse, was based on a well-known news story. Other cases (*see* text, *infra*) have held that even ideas based on *400-year-old Shakespeare plays* can be protected under *Desny* (*see Blaustein v. Burton*, 9 Cal. App. 3d 161 (1970)) so long as there exists an implied-in-fact contract to protect these ideas against use without payment. Moreover, in *Quirk*, the issue was *not* the Dicta's statement that the plaintiff widely published his book prior to the defendants' making a movie in some ways similar to

---

[14]    "Plaintiffs broadcast their Format to the world before allegedly making any contact or contract with Defendants." (Mot. 24.) Thus, Sony and Kripke would have this Court believe that ideas relative to the Format and/or the Original Series, and disclosed to them by Plaintiffs, cannot be protected under contract law, taking totally out of context the following language (the "Dicta") from *Quirk*: "Quirk elected to disclose the ideas in his novel to the entire world without any conditions. . . on the ability of persons to make whatever use of the ideas in the novel they wished. He cannot now claim defendants were nevertheless impliedly bound to pay for using the ideas, regardless of the precise circumstances under which they were exposed to the novel (if they were) years later." *Quirk*, 2013 WL 1345075, at *9.

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

his book, ***but rather that there was no contractual relationship (either express or implied) between the plaintiffs and the defendants relating to the defendants' use of the plaintiff's ideas***.

Here, Plaintiffs contend that there ***was*** an implied-in-fact contractual relationship between Plaintiffs, on the one hand, and Sony and Kripke, on the other hand.  Moreover, as opposed to the facts of *Quirk*, here the prior release of the Original Series ***in Spain*** did ***not*** make the ideas contained therein readily available to Sony and Kripke, as the Original Series had been broadcast ***in Spanish.  Here, Plaintiffs contend that, by allowing Defendants Sony and Kripke to view the English-subtitled Original Series DVD and the Original Series Flyer in the course of license negotiations, they gave them unique access to ideas[15] relating to both the Format and the Original Series.*** The ideas that Plaintiffs were intending to share with Sony and Kripke are ***not*** merely the ideas that an American viewer could access by viewing the English-subtitled Original Series DVD, but also were to include Plaintiffs' creative ideas as to how best to reconfigure the Format and the Original Series for a United States audience.

Additionally, as opposed to the facts of *Desny*, *Quirk*, or even *Blaustein*, here there can be ***no*** question that Sony ***valued*** Plaintiffs' idea contribution and ***bargained*** with Plaintiffs for the ability to use their ideas. ***Sony on August 4, 2015, made a specific offer to buy from Plaintiffs the right to use their ideas,*** including ideas Plaintiffs had as to how best to adapt the Original Series for an American audience (the "Sony Offer").[16]  Plaintiffs promptly countered the Sony Offer.

---

[15]     It goes without saying, of course, that an English-speaking American viewer would obtain little of value by watching Spanish-only episodes of the Original Series.

[16]     "Initial 18 month option: $6,000-applicable against the Purchase Price; Additional 18 month option extension: $6,000-non-applicable; Purchase Price: $60,000; Contingent Compensation:2.5% of MAGR (Standard Sony Definition); Episodic Royalty: $3000 per episode for U.S. network/ $2400 per episode for non-network; Series sale bonus: $15,000 for U.S. network/ $12,000 for cable (25/12 episodes- minimum of 6); Pilot EP fee: $20,000 U.S. network/ $16,000 non-network; Series EP fee:  $15,000  U.S.  network/

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

However, rather than acting in good faith, Sony *failed* in any way to respond to Plaintiffs' counter-offer and then proceeded *wantonly* to use Plaintiffs' ideas without even paying Plaintiffs the consideration set forth in the Sony Offer.

A.   <u>Plaintiffs Have Stated a Claim Under The *Desny* Line of Cases</u>

1.   *Desny*

*Desny* involved the plaintiff's conceiving a motion picture based upon an item from the news, a boy being trapped in an underground cave.  *Desny*, 46 Cal. 2d at 726-727.  Desiring to sell this idea to a major motion picture studio, the plaintiff communicated his idea to the secretary of a famous director working for Paramount Pictures, telling her that he was interested in selling his idea to Paramount Pictures.[17]  *Id.*  However, without engaging in any further discussions with the plaintiff and without compensating the plaintiff in any way, the director and Paramount Pictures went ahead and produced a motion picture very similar to that conceived by the plaintiff.  *Id.* at 724-725.  The defendants denied any liability to the plaintiff, contending that they never *expressly* promised to pay plaintiff anything.  *Id.* at 725, 729.

Quoting from Justice Traynor's dissent in *Stanley*, 35 Cal. 2d at 674, the *Desny* court stated that "'The policy that precludes protection of an abstract idea by copyright does not prevent its protection by contract.  *Even though an idea is not property subject to exclusive ownership, its disclosure may be of substantial benefit to the person to whom it is disclosed*.  That disclosure may therefore be consideration for a promise to pay. . . .'" *Desny,* 46 Cal. 2d at 733 (emphasis

---

$12,000 non-network w/ 3% bumps each season; EP credit (locked for life); Right to use existing screenplay material: Story only- $5,000; Teleplay- $10,000; Sony shall have the right to do subsequent productions and shall pay 50% for generic spinoffs and 25% for planted spinoffs; Holdback of U.S. exploitation of original series and format licensing in any English language territory" (Compl. ¶ 10.)

[17]   The plaintiff in this case disclosed his idea to the secretary, because she informed him that the director (and Paramount Pictures) could consider the plaintiff's idea only if they knew what his idea was.  *Desny* at 726-727.

18

EARLY
SULLIVAN
WRIGHT
GIZER &
McRAE LLP
ATTORNEYS AT LAW

163139.6

added).  The *Desny* court went on to state that recovery for the disclosure of an idea is ***not*** limited only to cases of ***express*** contracts, but held that "recovery [for disclosure of an otherwise unprotectible idea] may be based on contract ***either express or implied***. ***The person who can and does convey a valuable idea to a producer*** who commercially solicits . . . or ***who voluntarily accepts it knowing that it is tendered for a price should likewise be entitled to recover***."  *Id*. at 734 (emphasis added).  The key, according to the court, was whether the producer "voluntarily accept[s] the disclosure, knowing the conditions on which it is tendered." *Id*. at 739.

As is set forth above, here Plaintiffs conveyed valuable ideas to Sony and Kripke; and Sony and Kripke voluntarily accepted the disclosure of these ideas, well knowing that they were tendered for a price, with Sony indeed offering to Plaintiffs the Sony Offer in consideration of this disclosure.

### 2.     *Blaustein*

The *Desny* court's reasoning has been applied in many other cases, including *Blaustein*.  There, Mr. Blaustein, a movie producer,[18] conceived the idea of developing, producing and distributing a modern movie version (of which he would be the producer) of ***Shakespeare's 400-year-old play The Taming of the Shrew***, starring the real-life husband and wife celebrity acting team of Richard Burton and Elizabeth Taylor, to be directed by the great Italian stage director Franco Zeffirelli, with certain major elements being deleted from the original Shakespeare play and with certain scenes being added.  *Blaustein*, 9 Cal. App. 3d at 167.  In pitching his idea, Mr. Blaustein: contacted a talent agent who represented Burton and Taylor to

---

[18]     As the court noted, a movie producer is the person who puts together the key elements of a motion picture for the purpose of bringing it to life, including bringing together the key creative elements to be incorporated in the movie, whipping up enthusiasm for the development of the movie, supervising the execution of the script and its implementation into film, arranging for casting, and enticing key actors and the director to involve themselves with the project. *Blaustein*, 9 Cal. App. 3d at 167.

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**



EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

explain his ideas and to inquire whether they might be interested in participating; made numerous airplane trips, including to New York, Los Angeles, London, and Paris; on his own met with director Zeffirelli; met with Burton and Taylor; and had numerous meetings and/or conversations with the law firm that represented both Mr. Blaustein and Burton and Taylor. *Blaustein*, 9 Cal. App. 3d at 167-172. During various conversations with attorneys in this law firm, Mr. Blaustein attempted to negotiate varying compensation packages for himself, depending upon how much money (if any) was to be guaranteed to him up front. *Id.* at 170-171.

Notwithstanding the significant amount of effort put into the project by Mr. Blaustein, Richard Burton and Elizabeth Taylor appropriated Mr. Blaustein's ideas while completely freezing him out of the project. *Id.* at 172. The motion picture (starring Burton and Taylor, directed by Franco Zeffirelli, and containing the additions to and deletions from the original Shakespeare play suggested by Mr. Blaustein) was produced and exhibited, all without anyone paying any money to Mr. Blaustein or even offering him any credit in the motion picture. *Id.*

Quoting extensively from *Desny*, the court expounded on the concept of an implied contract in the motion picture industry: "If a studio wishes to have an idea disclosed to it and finds that idea of sufficient value to make use of it, it is difficult to see how any hardship is involved in requiring payment of the reasonable value of the material submitted." *Id.* at 178 (internal citation and quotation marks omitted). "Such inferred or implied promise. . . must be based on circumstances which were known to the producer at and preceding the time of disclosure of the idea to him and he must voluntarily accept the disclosure, knowing the conditions on which it is tendered." *Id.* at 182-183 (internal quotation mark omitted).

The *Blaustein* court concluded by stating an idea can be protected by contract ***even if it is not novel***, and that therefore "We are of the opinion that ***appellant's idea*** of the filming of Shakespeare's play 'The Taming of the Shrew' ***is one which may be protected by*** [express or implied] ***contract***" (*id*. at 184) (emphasis added).

163139.6

Given that both express and implied contracts are based upon a determination of the parties' manifestations of assent, the court held that such a determination "is a *question of fact* which may *not* be properly resolved in a summary judgment proceeding, *but must be resolved upon a trial of the issue*" (*id.*) (emphasis added).

*Here, Plaintiffs are in much the same circumstances as Mr. Blaustein was in the Blaustein case*. Plaintiffs acted as producers, attempting to elicit interest from Sony and Kripke in developing a United States television series based on the pre-existing Format and Original Series. Sony, a movie studio, and Kripke, a writer/director/showrunner, clearly wished to have Plaintiffs' ideas disclosed to them, *and indeed found those ideas to be of sufficient value that Sony presented to Plaintiffs the Sony Offer*.  Defendant Sony thus in fact *bargained* with Plaintiffs relative to Plaintiffs' ideas, going well beyond the conduct of the *Blaustein* defendants and *making it even more apparent that a contractual situation was created here*.  However, notwithstanding these facts and the implied-in-fact contract existing between Plaintiffs (on the one hand) and Sony and Kripke (on the other hand), Sony and Kripke (like the *Blaustein* defendants) in bad faith froze Plaintiffs out and utilized Plaintiffs' ideas without making any payment to them whatsoever.

### 3.    The *Quirk* Case

In *Quirk*, a writer, Joe Quirk ("Mr. Quirk"), in the 1990s widely published a book entitled *The Ultimate Rush* and, desirous of having it serve as the basis of a film development deal, hired CAA as his agent to distribute pre-release copies and synopses of the book to various entertainment industry entities.  *Quirk v. Sony Pictures Entm't Inc.*, 2013 WL 1345075 at *2 (N.D. Cal. 2013).  As a result of CAA's work, Warner Bros. eventually became interested in Mr. Quirk's book and obtained from Mr. Quirk an option on it, with Warner Bros. ultimately commissioning two separate screenplays based upon the book.  *Id.*  Nonetheless, Warner Bros. decided *not* to go forward with a movie based on the book, and allowed its option on the book to expire.  *Id.*

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

In 2012, some 14 years after the 1998 paperback publication of Mr. Quirk's book and long after Mr. Quirk had apparently abandoned his efforts to enter into a motion picture development deal for his book, Columbia Pictures (then owned by Sony Pictures Entertainment Inc.) released a motion picture entitled *Premium Rush*, which shared certain plot similarities with Mr. Quirk's book. *Id.* at *3. Mr. Quirk made a *Desny* claim relative to *Premium Rush*, claiming that the purported similarities between his book and Columbia Pictures' movie showed that CAA must have recently given to Columbia Pictures and/or its writers copies of the old Warner Bros. screenplays along with an old pre-release copy of Mr. Quirk's book (both of which items CAA maintained in its files for the entire 14-year period). *Id.* at *10. Mr. Quirk made this *Desny* claim notwithstanding the fact that Mr. Quirk did not claim any current contractual (either express or implied) relationship with Columbia Pictures relative to Mr. Quirk's book. *Id.* at *10 n. 6.

Notwithstanding Sony's and Kripke's misreading of the Quirk case, ***the Quirk court, in denying Mr. Quirk's Desny claim, did not stake out new ground but in fact relied upon Desny's concept of an implied contract***. The *Quirk* court emphasized that the essence of the *Desny* holding was that an abstract ***idea*** can be protected by ***contract law*** (as opposed to ***copyright's*** protection of a particular ***form*** of expression of an idea) where the elements of a contract are present (either express or implied): that is, where there is "an expectation on ***both sides***" (a "bilateral understanding of [the necessity of] payment" for an idea) "that transforms a claim. . . to a ***contractual*** claim." *Id.* at *7, emphasis added, quoting from *Montz v. Pilgrim Films & Television, Inc.,* 649 F.3d 975, 976-977 (9th Cir. 2011). The *Quirk* court found, however, that the evidence presented did ***not*** establish that Mr. Quirk had any dealings with Columbia Pictures that would have given rise (a) to any expectation by him of payment by Columbia Pictures or (b) to any expectation by Columbia Pictures that it might owe Mr. Quirk any money for use of any ideas contained in its movie. *Id.* at *11-*12. *Desny* does not protect ***ideas*** in the abstract

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

from use by third parties; rather, *Desny* holds that the creator of an idea can (either expressly or impliedly) enter into a ***contractual relationship*** with a third party wherein that third party becomes obligated to pay for its use of the creator's idea.

The *Quirk* court found that, as there was no ***contractual*** relationship (express or implied) whatsoever between Mr. Quirk, on the one hand, and the defendants, on the other hand, it made little difference legally whether the defendants got ideas for their movie from a copy of Mr. Quirk's book purchased on the open market or from materials given to them by CAA.  *Id.*  In ***neither*** case would ***contract*** law (including the *Desny* case) give the ideas embodied in Mr. Quirk's book any protection not provided by copyright.  *It was in this context that the Quirk court made its Dicta statement that Mr. Quirk's initial widespread publication of his book was not the type of disclosure that could constitute "consideration for a promise to pay" and therefore allow for contractual protection of the ideas set forth in Mr. Quirk's book.  Id.*

As is explained above, Sony Pictures' and Kripke's situation vis-à-vis Plaintiffs is very different from that subsisting between the Quirk defendants and Mr. Quirk.  First, Plaintiffs allege that there ***was*** a contractual relationship (implied in fact) between themselves, on the one hand, and Sony and Kripke, on the other hand.  Second, Plaintiffs allege that they ***did*** in fact (through their agents) provide to Sony and Kripke the English-subtitled Original Series DVD; this Original Series DVD gave Sony and Kripke ***unique*** access to the concepts underlying the Format and the Original Series, ***concepts unavailable to Sony or Kripke merely as a result of the broadcasting of the Original Series in Spain***.  Third, Sony ***recognized*** Plaintiffs' expectation of payment for use of Plaintiffs' valuable ideas ***by presenting the Sony Offer to Plaintiffs***, whereas in *Quirk* the movie studio had ***not*** presented any offer whatsoever to Mr. Quirk and indeed (as the court found) acquired ***nothing*** of value from Mr. Quirk.  As Quirk makes clear, the finding of liability from a movie studio to an idea creator depends upon the implicit bargain made between the

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

163139.6

parties, an implicit bargain lacking in Quirk but so obviously present here.

In sum, Defendants Sony and Kripke misinterpret the holding of the *Quirk* case, and the Court should refuse to dismiss Plaintiffs' implied contract claim. Plaintiffs have pled facts sufficient to support such a claim under *Desny*, and they should be given the opportunity to prove these facts.

## V.    CONCLUSION

For the above reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion in full.

Respectfully submitted,

Dated:  January 19, 2017                EARLY SULLIVAN WRIGHT
                                                        GIZER & McRAE LLP


                                                    By: */s/--Devin A. McRae*
                                                            DEVIN A. McRAE
                                                            Attorneys for Plaintiffs
                                                            ONZA   PARTNERS   SL   and   ONZA
                                                            ENTERTAINMENT SL

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

163139.6